SEP 3 2021 AM11:41
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

COUNTY OF FAIRFIELD

No. 3:21mj890(SDV)

September 3, 2021

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Julio J. Rodriguez, being duly sworn, depose and state as follows:

1.      I am a Police Officer of the Norwalk Police Department and have been so employed since 2008. In 2013, I was assigned to serve as a Task Force Officer with the Drug Enforcement Administration ("DEA"). I was assigned to my current assignment as part of the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Bridgeport Police Department, Norwalk Police Department, Stamford Police Department, Stratford Police Department, and Milford Police Department.

2.      During the course of my career, I have participated in hundreds of criminal investigations, including investigations into suspected narcotics trafficking and money laundering. My participation in the investigations has included coordinating controlled purchases of narcotics utilizing confidential informants, cooperating witnesses and undercover law enforcement officers; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury and District Court proceedings; and interviewing individuals and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances and other illegal activities.

3.      Based on the above training and experience, I am well-versed regarding the means and methods used by persons involved in the use, possession, transportation, distribution and sale

of controlled substances, the motivation of such persons involved in these crimes, and the methods utilized to facilitate narcotics distribution.

4.     Based on my training and experience, I am also aware of the ways that persons involved in narcotics trafficking use cellular telephones in furtherance of their criminal activities and of the type of evidence typically found in such devices when used by drug dealers.

5.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I am the co-case agent on the investigation which is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed herein.

6.     I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on the following: (1) my personal participation in the investigation; and (2) information provided to me by Special Agents/Task Force Officers of the DEA in the New York Field Office.

### PURPOSE OF THE AFFIDAVIT

7.     On August 24, 2021, I signed an affidavit (hereinafter, the "Original Affidavit") in support of a Criminal Complaint for the arrest of Orlando JIMENEZ (D.O.B. xx/xx/1974) for a violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  The Original Affidavit has been attached at Attachment C and incorporated herein.

8.     On the basis of that application, on that same date, August 24, 2021, the Honorable

S. Dave Vatti, U.S.M.J. issued an arrest warrant for JIMENEZ.

9.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following devices (collectively the "**JIMENEZ TELEPHONES**"), further described in Attachment A, which were obtained from Orlando JIMENEZ at the time of his arrest on or about August 26, 2021 and are currently maintained at the Bridgeport Resident Agency of the DEA, and the extraction from that property of electronically stored information described in Attachment B:

> a.   One white and gold colored iPhone cellular telephone ("**JIMENEZ TELEPHONE #1**") identified further as DEA exhibit N-44;
>
> b.   One blue colored iPhone cellular telephone ("**JIMENEZ TELEPHONE #2**") identified further as DEA exhibit N-44; and
>
> c.   One greyish dark blue colored Motorola Razr flip cellular phone ("**JIMENEZ TELEPHONE #3**") identified as DEA exhibit N-43.

10.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a) (1) (Possession With Intent to Distribute Controlled Substances), Title 21, United States Code, Section 846 (Attempt and Conspiracy to Possess with Intent to Distribute Controlled Substances), and Title 21 United States Code, Section 843 (b) (Use of a Communication Facility) (collectively, the "Target Offenses"), have been committed by JIMENEZ and the **JIMENEZ TELEPHONES** to be searched were used as instrumentalities of these offenses and contain evidence of the commission of the Target Offenses.

## **PROBABLE CAUSE**

11.     As set forth in the Original Affidavit, a DEA confidential source ("CS-1") provided information to investigators in August 2021 regarding JIMENEZ and his involvement in trafficking quantities of narcotics in the region and was able to provide a phone number for JIMENEZ. *See* Original Affidavit at ¶ 9. Thereafter, CS-1 made a series of consensually recorded

calls on August 2, August 3, and August 4, 2021, in order to obtain from JIMENEZ sample quantities of fentanyl that JIMENEZ was offering to sell the source in bulk quantities. *See id.* ¶¶ 10-19. DEA Task Force members conducted surveillance during each of these meetings and was able to identify JIMENEZ as the individual delivering these quantities to the source in Norwalk. *See id.* JIMENEZ thereafter agreed to sell the source 100 grams of fentanyl in exchange for $3,800, in a controlled purchase on August 10, 2021 that was surveilled by DEA Task Force members. *See id.* ¶¶ 20-24. The substance was submitted to the DEA Northeast Laboratory in New York for forensic analysis which confirmed the substance contained fentanyl and had a net weight of 99.1 grams.

12.     On August 24, 2021, Judge Vatti issued the above-referenced arrest warrant for JIMENEZ. On that same date, at the direction of agents, CS-1 made a consensually monitored and recorded telephone call to JIMENEZ utilizing cellular telephone number (914) 280-5755 and arranged for the purchase of three kilograms of fentanyl. JIMENEZ asked CS-1 to meet him later that day in Norwalk to discuss the purchase.

13.     Later that day, DEA Task Force members met with CS-1 at a pre-determined location, outfitted CS-1 with a recording device and conducted a search of CS-1's person and vehicle. No contraband or money was found. Surveillance was established in the vicinity of the McDonald's in Norwalk in anticipation of the meeting between JIMENEZ and CS-1. JIMENEZ telephoned CS-1 and directed CS-1 to the parking lot of the Total Wine & More which was down the street from the McDonald's. DEA Task Force members then established surveillance in the vicinity of the Total Wine & More and observed JIMENEZ in the parking lot and JIMENEZ's motorcycle parked nearby in the lot. A second motorcycle was parked next to JIMENEZ's motorcycle that was believed to be the second motorcycle from the August 2, 2021 meeting

between CS-1 and JIMENEZ. DEA Task Force Members subsequently observed a second male subject who was believed to be the same unidentified male from the August 2, 2021 meeting that acted as a lookout standing nearby.

14.     Task Force members observed JIMENEZ enter CS-1's vehicle upon CS-1 arriving at the location and a few minutes later, members observed JIMENEZ depart CS-1's vehicle, meet up with the unidentified male subject and both subjects depart on their respective motorcycles.

15.     Following the meeting, Task Force members surveilled CS-1 back to the neutral location.  During a debrief with Task Force members, CS-1 confirmed that he/she had discussed the logistics of the pending three-kilogram transaction with JIMENEZ including the anticipated date of August 26, 2021 and the anticipated location to be one of several nearby hotels in Norwalk. CS-1 also explained that during the discussion, JIMENEZ opened the fanny pack that he had been carrying and showed CS-1 that he (Jimenez) had several cell phones with him.  JIMENEZ then pointed to one of the phones and told CS-1 that one of the phones was for CS-1, which CS-1 understood to mean that this particular phone was going to be used by JIMENEZ to communicate exclusively with CS-1.  JIMENEZ then provided cellular telephone number (551) 323-9289 as his new telephone number which JIMENEZ was going to use for communications with CS-1. JIMENEZ also instructed CS-1 to download Telegram which is an app that uses end to end encryption.

16.     On August 26, 2021, at the direction of agents, CS-1 contacted JIMENEZ and arranged to meet JIMENEZ at the Extended Stay Hotel, 400 Main Avenue, Norwalk, Connecticut to complete the three-kilogram fentanyl transaction. DEA Task Force Members established surveillance in the vicinity of the hotel. DEA Task Force members met with CS-1 at a pre-determined location, outfitted CS-1 with a recording device and conducted a search of CS-1's

person and vehicle. No contraband or money was found. Task Force members surveilled CS-1 from the neutral location to the parking lot of the hotel.

17.     At approximately 1:20 p.m., Task Force members observed a black Chevrolet Malibu bearing New Jersey registration A56NXM which was registered as a rental vehicle arrive at the hotel. There was a short ramp that led from the entrance of the hotel up to the main parking area. Surveillance units observed the Malibu enter the bottom of the ramp and then exit the ramp to the main parking area though the Malibu was not visible to the surveillance units as it travelled up the ramp. After the Malibu entered the main parking area of the hotel, the Malibu drove past CS-1's vehicle and circled the entire parking lot before parking in a spot away from CS-1's vehicle. Task Force members were able to observe the driver of the Malibu, subsequently identified as Roderick Raipen, looking into vehicles as he was traveling through the parking lot. Based on my training, experience, and knowledge of this investigation, I believe that Raipen was employing a commonly used counter-surveillance practice by observing the vehicles parked in the lot for surveillance units. DEA Task Force members then observed JIMENEZ walking up the ramp towards the main parking area and CS-1's vehicle. DEA Task Force members observed JIMENEZ meet with CS-1 by CS-1's vehicle. A few moments later, DEA Task Force members observed JIMENEZ and CS-1 walk towards the Malibu though the Malibu was parked out of sight of surveillance units. DEA Task Force members then observed JIMENEZ and CS-1 walk back to CS-1's vehicle where they engaged in conversation for several minutes. CS-1 then walked towards the entrance to the hotel as JIMENEZ remained by CS-1's vehicle. CS-1 was able to communicate with surveillance units that he/she had observed two-kilogram bricks in the rear of the Malibu. At that time, Task Force members arrested JIMENEZ without incident, detained Raipen without incident at the Malibu and recovered two-kilogram bricks of suspected fentanyl from the rear of

the Malibu.   At the time of the arrest, **JIMENEZ TELEPHONE #1** and **JIMENEZ TELEPHONE #2** were seized from JIMENEZ and collected and marked as DEA exhibit N-44. **JIMENEZ TELEPHONE #3** was seized from the center console of the rental vehicle and collected and marked as DEA exhibit N-43.   Rental paperwork recovered from the vehicle revealed that JIMENEZ had rented the Malibu in New Jersey earlier that morning.  JIMENEZ was read his Miranda Rights after being arrested.  JIMENEZ made an initial statement that the Raipen was just a friend who drove who to the transaction and had no knowledge of the drugs that were in the car.  JIMENEZ stated that the seized drugs were two kilograms of heroin.  At that point in the interview, JIMENEZ declined to answer any additional questions without a lawyer present and the interview was terminated.

18.    On this same date, **JIMENEZ TELEPHONE #1, JIMENEZ TELEPHONE #2** and **JIMENEZ TELEPHONE #3** were collected as evidence and are currently being maintained at the Bridgeport Residence Agency of the DEA.  Based upon my training and experience, I know that the **JIMENEZ TELEPHONES** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **JIMENEZ TELEPHONES** first came into the possession of the DEA Task Force.

19.    The investigation into JIMENEZ's drug trafficking activity has shown that cellular telephone communications between JIMENEZ and CS-1 was consistent with my training and experience, from which I am aware that drug traffickers routinely use multiple mobile telephones to communicate with coconspirators to conduct drug-related transactions, including to arrange meet locations, and negotiate prices of drug transactions, and to facilitate other aspects of ongoing narcotics activity.  Furthermore, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to

7

communicate with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the drug operation remain intact. The use of multiple cell phones at the same time is one way to achieve such compartmentalization. I and other law enforcement officers that I have worked with in drug investigations have had the opportunity to obtain search warrants for cell phones in the past. The execution of these search warrants have resulted in the recover of, among other things, text messages, photographs, messages sent over encrypted platforms such as WhatsApp, and phone contacts that have constituted evidence of drug trafficking. I believe that the **JIMENEZ TELEPHONES** are being used, in part, for that purpose.

## INFORMATION REGARDING CELLULAR TELEPHONES

20.     Based on my knowledge, training, and experience, I am aware that a mobile or cellular telephone, commonly referred to as a cell phone, is a handheld wireless device used for voice and data communication through radio signals. A cell phone, usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cell phones offer a broad range of other capabilities. These capabilities include, among others: running software or applications; storing contact names and phone numbers in electronic address books, commonly referred to as a cell phone user's contacts; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include geo-location and global positioning system ("GPS") technology for determining the location of the device.

21.     Based on my training and experience, I know that when a cellular device acting as

a camera is used to take a phonograph or video, the device will often store information beyond the photograph itself. This "meta data" can include, the size of the file, its location on the device, the time and date of the photograph or video, GPS coordinates for where the photograph or video was taken, whether and when it has been accessed or modified, what device took the photograph or video, and other properties or data regarding the photograph or video.

22.     As described above and in Attachment B, this application seeks permission to search and seize data and information that the **JIMENEZ TELEPHONES** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that the information set forth in Attachment B tends to exist on wireless telephones like the **JIMENEZ TELEPHONES**. I am also aware that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.     Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated

to data and information described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

24.     It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

25.     It is also requested that warrant be deemed executed once **the TARGET TELEPHONES** have been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## CONCLUSION

26.     Based on this information set forth in this affidavit as well as the Original Affidavit, I respectfully submit that there is probable cause to believe that the **JIMENEZ TELEPHONES** contain evidence of the Target Offenses as specified in Attachment B, which is incorporated herein by reference.

27.     Because this warrant seeks only permission to examine a device already in law

enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Respectfully submitted,

Julio J. Rodriguez
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this ___3ʳᵈ___ day of September 2021.

/s/ S. Dave Vatti

HON. S DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The listed **JIMENEZ TELEPHONE** is currently located at the Bridgeport Resident Agency of
the DEA:

> One white and gold colored iPhone cellular telephone (**JIMENEZ TELEPHONE #1**)
> seized on August 26, 2021 identified further as DEA exhibit N-44

 

This warrant authorizes the forensic examination of the **JIMENEZ TELEPHONE** for the
purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A

The listed **JIMENEZ TELEPHONE** is currently located at the Bridgeport Resident Agency of the DEA:

> One blue colored iPhone cellular telephone (**JIMENEZ TELEPHONE #2**) seized on August 26, 2021 identified further as DEA exhibit N-44

 

This warrant authorizes the forensic examination of the **JIMENEZ TELEPHONE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A

The listed **JIMENEZ TELEPHONE** is currently located at the Bridgeport Resident Agency of the DEA:

One greyish dark blue colored Motorola Razr flip cellular phone (**JIMENEZ TELEPHONE #3**) seized on August 26, 2021 identified further as DEA exhibit N-43

 

This warrant authorizes the forensic examination of the **JIMENEZ TELEPHONE** for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

All records contained in the **JIMENEZ TELEPHONE** listed in Attachment A to include

the following:

1.  the telephone number, ESN number, serial number, and SIM card number of the JIMENEZ TELEPHONE;

2.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the JIMENEZ TELEPHONE;

3.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1) and 846);

4.  any and all records, however created or stored, which tend to demonstrate ownership and use of the JIMENEZ TELEPHONE, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the JIMENEZ TELEPHONE;

5.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the JIMENEZ TELEPHONE, such as passwords, sign-on codes, and program design;

6.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7.  saved searches, locations, and route history in the memory of the JIMENEZ TELEPHONE;

8.  internet browsing history, to include, internet searches in the memory of each JIMENEZ TELEPHONE;

9.  any and all evidence relating to instant messaging applications or programs on the JIMENEZ TELEPHONE;

10. images and videos in the memory of each JIMENEZ TELEPHONE; and

11. evidence of user attribution showing who used or owned the JIMENEZ TELEPHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described JIMENEZ TELEPHONE may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

## ATTACHMENT C

### ORIGINAL AFFIDAVIT

3:21mj858 (SDV)

AUG 24 2021 PM2:37
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | ss: Bridgeport, Connecticut |
| | : | |
| COUNTY OF FAIRFIELD | : | August 24, 2021 |
| | : | |
| | : | **Filed Under Seal** |

### AFFIDAVIT

I, Julio J. Rodriguez, being duly sworn, depose and state as follows:

1.      I am a Police Officer of the Norwalk Police Department and have been so employed since 2008. In 2013, I was assigned to serve as a Task Force Officer with the Drug Enforcement Administration ("DEA"). I was assigned to my current assignment as part of the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Bridgeport Police Department, Norwalk Police Department, Stamford Police Department, Stratford Police Department, and Milford Police Department.

2.      During the course of my career, I have participated in hundreds of criminal investigations, including investigations into suspected narcotics trafficking and money laundering. My participation in the investigations has included coordinating controlled purchases of narcotics utilizing confidential informants, cooperating witnesses and undercover law enforcement officers; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury and District Court proceedings; and interviewing individuals and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances and other illegal activities.

3.      Based on the above training and experience, I am well-versed regarding the means and methods used by persons involved in the use, possession, transportation, distribution and sale

of controlled substances, the motivation of such persons involved in these crimes, and the methods utilized to facilitate narcotics distribution.

4.     Based on my training and experience, I am also aware of the ways that persons involved in narcotics trafficking use cellular telephones in furtherance of their criminal activities and of the type of evidence typically found in such devices when used by drug dealers.

5.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.   I am the co-case agent on the investigation which is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed herein.

6.     I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on the following: (1) my personal participation in the investigation; and (2) information provided to me by Special Agents/Task Force Officers of the DEA in the New York Field Office.

7.     I submit this affidavit in support of a criminal complaint and an application for an arrest warrant charging ORLANDO JIMENEZ (D.O.B. xx/xx/1974) with a violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute Controlled Substances).

8.     Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint, it does not include all information gathered to date by

the DEA and other law enforcement entities in relation to this investigation. Rather, it contains information that I believe establishes probable cause to believe that JIMENEZ committed violations of 21 U.S.C. § 841.

## PROBABLE CAUSE

9.     In August of 2021, the Task Force received information from a confidential source ("CS-1") and through members of the DEA New York Field Division regarding JIMENEZ and his involvement in trafficking of narcotics in the region.  CS-1 has been working with DEA since 2012 for judicial consideration in a pending criminal matter.  The DEA Task Force has received reliable information from CS-1 in connection with prior investigations and has found CS-1 to be reliable.

### JIMENEZ Provides Fentanyl Samples to CS-1

10.     On or about August 2, 2021, CS-1 agreed to make a consensually monitored telephone call to an individual, subsequently identified as JIMENEZ, who CS-1 believed was looking to sell kilogram quantities of fentanyl.  During that call, CS-1 and JIMENEZ arranged to meet in the vicinity of Total Wine & More in Norwalk, Connecticut, so that JIMENEZ could provide CS-1 with a sample of fentanyl.  In anticipation of the meeting, case agents outfitted CS-1 with a recording device and conducted a physical search of both CS-1's person and vehicle.  No contraband or money was found.  Thereafter, Task Force members conducted surveillance as CS-1 traveled to the meet location.

11.     Once at the location, Task Force members observed two motorcycles pull into the Stop & Shop parking lot, which is adjacent to the parking lot of Total Wine & More.  Both motorcycles were being operated by Hispanic males.  The two subjects parked their motorcycles between pickup trucks making it difficult to obtain license plate information.

12.     Upon arriving at the meet location, CS-1 placed a called into JIMENEZ, who told

CS-1 to drive over to the Stop & Shop.  CS-1 followed JIMENEZ's instructions, at which point Task Force members observed one of the males—recognized by Task Force members to be JIMENEZ—get off his motorcycle and approach CS-1, who was now standing outside of his/her vehicle.  The second male stood nearby, appearing to act as a lookout, and did not interact with CS-1.  After a brief conversation between CS-1 and JIMENEZ, law enforcement personnel observed CS-1 enter his vehicle and depart the meet location. Task Force members followed CS-1 to a pre-arranged location where they retrieved from CS-1 the recording device and a sample of suspected fentanyl.[1]

13.     Investigators also attempted to surveil the two motorcycles as they left the meeting, but the two subjects quickly entered the Merritt Parkway southbound at a high rate of speed making it difficult and extremely unsafe to follow.  For that reason, surveillance was terminated.

14.     During the debrief, CS-1 advised Task Force members that in addition to providing a sample of suspected fentanyl, JIMENEZ and CS-1 also discussed a future transaction for the purchase of two kilograms of fentanyl for the price of $38,000 per kilogram.  At that time, JIMENEZ asked if CS-1 would be willing to pick up the kilograms of fentanyl in New York.  CS-1 responded explained that because CS-1 was traveling from up north, it would be best to meet with JIMENEZ halfway to do the deal.  JIMENEZ agreed to make the exchange in the parking lot of Total Wine & More.

15.     The next day, on August 3, 2021, CS-1 contacted JIMENEZ by telephone and informed him that the sample was of poor quality.  In response, JIMENEZ agreed to meet CS-1 at the Total Wine & More in Norwalk to provide another sample.

---

[1] Case agents attempted to field test the suspected fentanyl, but due to the nature and potential dangers of the substance, investigators were not able to obtain results on this sample.

16.      On August 4, 2021, Task Force members initiated surveillance at Total Wine &
More in Norwalk in anticipation of the second meeting between CS-1 and JIMENEZ. Consistent
with the prior meeting, case agents outfitted CS-1 with a recording device and conducted a search
of both CS-1's person and vehicle before the meeting.   No contraband or money was found.  CS-
1 thereafter contacted JIMENEZ, who instructed CS-1 to meet him at the McDonald's down the
road from Total Wine & More.  Task Force members continued surveillance as CS-1 traveled to
the new location and also established surveillance in the area of the McDonald's.

17.      Once at the McDonald's, Task Force members observed a motorcycle with a New
York plate arriving at the location.  The motorcycle was being operated by JIMENEZ, who was
wearing a black leather jacket.  JIMENEZ drove around the McDonald's and parked on the west
side of the parking lot against a fence, which again made it difficult for investigators to obtain a
license plate number.  Task Force members thereafter observed JIMENEZ enter the restaurant.
After a brief time, CS-1 arrived on scene and parked next to JIMENEZ's motorcycle. Task Force
members observed JIMENEZ exit the McDonald's, walk to CS-1's vehicle, and engage CS-1 in
conversation for several minutes.

18.      As the meeting ended, Task Force members observed CS-1 enter his/her vehicle
and depart the meeting location.  Surveillance of CS-1 continued to a pre-arranged location where
case agents retrieved the recording device and two samples of suspected fentanyl.  During a
subsequent debrief, CS-1 informed investigators that in addition to providing two samples of
suspected fentanyl, JIMENEZ also apologized to CS-1 for the first sample not being good.

19.      On August 6, 2021, Task Force members traveled to the DEA Northeast lab located
in New York City, and conducted field tests in a controlled and safe environment on the two
samples of suspected fentanyl. The first sample was an off-white like type powder which tested

negative for fentanyl. The second sample which was darker in color tested positive for fentanyl. Both samples were submitted to the lab and were pending forensic analysis.

**Controlled Purchase of Fentanyl from JIMENEZ**

20.     On or about August 6, 2021, CS-1 made a consensually recorded and monitored call to JIMENEZ to obtain additional quantities of fentanyl. During the conversation, JIMENEZ agreed to sell CS-1 one hundred (100) grams of fentanyl for $3,800.

21.     On August 10, 2021, Task Force members met with CS-1 at a pre-determined location, outfitted CS-1 with a recording device and conducted a search of CS-1's person and vehicle. No contraband or money was found. CS-1 was thereafter provided with $3,800 of Official Advanced Funds to be used for the purchase of fentanyl from JIMENEZ. Thereafter, CS-1 made a consensually recorded and monitored telephone call to JIMENEZ wherein CS-1 and JIMENEZ agreed to meet again at the parking lot of the McDonald's on Main Avenue in Norwalk. Surveillance was established in the vicinity of the McDonald's where Task Force members observed JIMENEZ next to a motorcycle at a strip mall located across the street from the McDonald's. He appeared to be wearing shorts, a red shirt, and a fanny pack across his chest. As CS-1 pulled into the McDonald's parking lot, investigators observed JIMENEZ walk across the street and enter CS-1's vehicle. Around this time, a Task Force member on foot was able to obtain a picture of the license plate from JIMENEZ's motorcycle. The license plate, bearing New York 480AN1, was registered to JIMENEZ with an address in Yonkers, New York.

22.     After a brief time, Task Force members observed JIMENEZ exit CS-1's vehicle and enter the McDonald's. Case agents followed CS-1 back to a neutral location where CS-1 turned over a plastic shopping bag that contained a vacuumed sealed bag that contained a knotted plastic bag containing a hard brownish substance believed to be fentanyl. As this happened, other

Task Force members observed JIMENEZ return to his motorcycle and depart the strip mall parking lot. JIMENEZ rode towards the Merritt Parkway Southbound and surveillance was terminated.

23.     During a debrief with Task Force members, CS-1 confirmed that JIMENEZ provided 100 grams of suspected fentanyl in exchange for $3,800. CS-1 further explained that JIMENEZ produced the suspected fentanyl from the fanny pack that had been strapped across his chest. CS-1 and JIMENEZ also again discussed the future purchase of two kilograms of fentanyl.

24.     On August 13, 2021, case agents traveled to the DEA Northeast lab in New York City and conducted a field test in a safe and controlled environment on the hard brownish substance which tested positive for the presence of fentanyl.

25.     Based upon the foregoing, there is probable cause to believe and I do believe that on or about August 10, 2021, in the District of Connecticut, ORLANDO JIMENEZ had possessed with intent to distribute controlled substances, namely fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

Respectfully submitted,

Julio J. Rodriguez
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this ___24th___ day of August 2021.

/s/ S. Dave Vatti

HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

7